**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3444-22

A.A.-C.,

    Plaintiff-Respondent,

v.

B.C.,

    Defendant-Appellant.

_____

Submitted November 20, 2024 – Decided March 5, 2025

Judges Currier and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FM-20-0060-21.

Colasurdo Law, LLC, attorneys for appellant (Vito Colasurdo, Jr., on the briefs).

Harber Silver Russoniello & Dunn, attorneys for respondent (Karin Duchin Haber, of counsel and on the brief; Jennifer M. Russoniello, on the brief).

PER CURIAM

In this matrimonial dissolution matter, defendant, B.C.,[1] appeals from a June 5, 2023 final judgment of divorce (FJOD) awarding plaintiff A.A.-C. sole legal and physical custody of the parties' son, incorporating the parties' consent order for civil restraints, changing the parties' son's name to reflect both parties' last names, ordering defendant to have therapeutic supervised visitation, and awarding plaintiff $750 per week in child support.  Defendant also appeals from a November 4, 2022 order denying his motion to change his parenting time from therapeutic supervised to unsupervised, and a January 6, 2023 order denying reconsideration of that order.

Finding sufficient credible evidence in the record in light of the applicable legal principles, we affirm the trial court's decisions as to custody, parenting time, the child's name change, and the continued civil restraints.  We vacate the child support award and remand solely for the court to state its reasons for its determination.

---

[1] Given our discussion of mental health diagnoses and domestic violence, to protect confidentiality, we use initials to identify the parties and a fictitious name to identify the minor child pursuant to Rule 1:38-3(a)(2) and (d)(10).

I.

A.

The parties were married on February 10, 2017, and share one child, E.A.-C. (Evan), born on January 27, 2020. Plaintiff and defendant lived together until May 2020, when plaintiff sought and obtained a temporary domestic violence restraining order (TRO) against defendant alleging the predicate act of terroristic threats, N.J.S.A. 2C:12-3(a), and setting forth a prior history of domestic violence. In July 2020, plaintiff filed a complaint for divorce based on irreconcilable differences and extreme cruelty. The parties entered into a consent agreement for civil restraints in August 2020, resolving the TRO, but prohibiting defendant from having contact with plaintiff and, among other conditions, requiring defendant to undergo evaluations and treatment and forfeit his firearms.[2]

B.

While awaiting trial on the divorce, the parties filed numerous motions for pendente lite relief. Some temporary relief was granted and the restraints were continued.

---

[2] The TRO indicates defendant had "[forty] high[-]capacity magazines and [seventeen] firearms," all of which were seized.

The civil restraints agreement prohibited defendant from "any kind of contact or communication whatsoever with . . . [p]laintiff and/or her parents, except to discuss issues related to [Evan], . . . via email or text message only," and barred him "from any residence in which . . . [p]laintiff resides." The agreement also required defendant to forfeit all his weapons and firearms identification cards, comply with alcohol screening for at least six months, submit to testing before all parenting time sessions, complete a substance abuse evaluation as part of a mandatory risk assessment, adhere to any recommended treatment, and complete a domestic violence education program.

Plaintiff was designated the "primary residential custodian for [Evan]," and defendant was limited to "supervised parenting time" pending the outcome of the risk assessment evaluation.

Defendant submitted to a risk assessment conducted by Dr. Alison Stasser Winston, Ph.D. Dr. Winston recommended that defendant exercise therapeutic supervised parenting time of the parties' then-ten-month-old son through Safe Harbor Access Center (Safe Harbor).

In November 2020, plaintiff filed a motion, seeking to enforce defendant's compliance with Dr. Winston's recommendations, and defendant cross-moved to designate his sister as supervisor for his parenting time rather than Safe Harbor. The trial court ordered defendant to continue therapeutic supervised

4

parenting time with Safe Harbor and denied the cross-motion. In denying relief, the court cited to Dr. Winston's report, detailing audio and video recordings that "highlight[ed] violent and profane language" used by defendant, and describing events that led Dr. Winston to express "concern for [Evan's] safety while [d]efendant continue[d] to develop parenting skills." The court designated Dr. Mark Singer, Ed.D., as the court-appointed forensic mental health expert to conduct a "[b]est [i]nterests [e]valuation."

In September 2021, plaintiff filed a motion requesting the records of defendant's parenting time supervisor be released to Dr. Singer, to amend her complaint for divorce to seek sole legal custody of the parties' son, and for other pendente lite financial relief. Defendant cross-moved to again designate his family as supervisors for his parenting time, among other relief. In December 2021, the trial court denied defendant's application, finding, "[b]ased on a review of the supervised parenting time reports, [d]efendant ha[d] not submitted evidence . . . that modification [of supervised parenting time] would be in [Evan]'s best interests" and granted plaintiff's application to amend her complaint to reflect that she was "requesting sole legal custody of [Evan] instead of joint legal custody" because "[d]efendant would not be prejudiced by such change given that discovery ha[d] yet to be completed."

On February 9, 2022, the court denied defendant's request for reconsideration and ordered defendant to have therapeutic supervised parenting time at Resolve Community Counseling Center (Resolve), which defendant thereafter moved to terminate in favor of supervision by his family. In November 2022, the court issued a Statement of Reasons, denying defendant's motion to terminate supervised parenting time at Resolve, finding "[d]efendant ha[d] not submitted evidence . . . that modification would be in [Evan]'s best interests." The court later denied defendant's motion to reconsider the November 4 order, and defendant subsequently filed an answer to plaintiff's amended complaint for divorce and a counterclaim.

C.

The following facts are derived from the record of the five-day trial in early 2023 during which plaintiff, defendant, and several experts testified, and video, audio recordings, and photographs were also presented to support the abuse allegations.

The parties met in June 2016, began living together in January 2017, and married in February 2017. It was undisputed that defendant suffers from post-traumatic stress disorder (PTSD) after serving in the United States Marine Corps from 2002 through 2008. Defendant explained he enlisted after the September 11, 2001 terrorist attacks and was deployed to active combat before he was

6

honorably discharged due to his PTSD. He recounted that, upon return, he engaged in treatment sporadically, declining recommended medication as he previously abused benzodiazepines prescribed for him in the military. He obtained a bachelor's degree and a master's degree in engineering.

Plaintiff testified she was not aware of defendant's mental health condition until after they were married, when he sought disability benefits. Plaintiff claimed she suggested defendant seek treatment, but he declined. She recalled defendant returning from a medical appointment in 2017 informing her "the doctor had prescribed benzos," after which defendant "crushed" and "snorted" pills. After an incident in which defendant was arrested while abusing the drugs, plaintiff described defendant as expressing suicidal feelings and asking plaintiff to "get a knife[] and kill him because he did not want to live anymore." She explained after that incident defendant began using medical marijuana, describing defendant as "happier" and for the first year of marriage, they "didn't have as many arguments."

Plaintiff testified that the first incident of physical abuse occurred in February 2019 when defendant became angry that plaintiff loaned money to a friend. Defendant became "physically violent" and "pinned [her] down on the bed and . . . told [her], [b****], I'm going to throw you out of the God damn window." As a result of this altercation, plaintiff sustained bruises on both arms,

7

which she documented by taking photographs that she introduced at trial. She did not report this incident to the police "[b]ecause [she] was afraid that [defendant] would kill himself."

Plaintiff testified that after Evan was born in January 2020, defendant began "changing his behavior" and constantly criticized her and her mother who had come from Brazil to stay with them after the child was born. Plaintiff began recording defendant when they had arguments because she "was afraid for [her] life and for [her] child's life." She testified about numerous incidents in which defendant was verbally abusive, and she introduced video and audio evidence demonstrating the conduct. Those recordings demonstrate defendant yelling at plaintiff, shouting profanities at her, threatening her in the presence of Evan, and making concerning statements regarding the child.

One recording taken in March 2020 and played at trial, captures defendant threatening to "kick [plaintiff's] mom out" and then "kick [plaintiff] out." Defendant told plaintiff he told her mother he didn't "need to hear about [her] f[***]ing life" because "[he's] a f[***]ing killer" and does not "deal with this s[***]." Plaintiff told defendant she wanted to "be mature here" and "do the right thing" because they "have a son together." Defendant responded he did not want her "f[***]ing [Evan] up." Using expletives, he called plaintiff "so dumb," "so stupid," "an idiot," and "a dummy." Plaintiff called defendant "a

monster" and he replied, "[y]ou're going to find out how much of a monster I am."

The recording also reflects defendant calling plaintiff a "f[***]ing ignorant b[****]," a "self-righteous f[***]ing b[****]" and threatening he was "about to f[***]ing put a hole in this God damn wall." He ridiculed plaintiff's parenting methods as "stupid" and "mak[ing] no f[***]ing sense."

In a profanity-laced tirade regarding plaintiff taking too long to breastfeed the three-week-old baby, who defendant accused of "crying for the sake of crying because he wants to be a little b[****]," defendant yelled, "[i]f it was a [thirty]year-old man, I would beat the s[***] out of him and that would give him something to cry about." Plaintiff explained defendant physically restrained her from caring for the child, which she corroborated in a recording in which defendant berated plaintiff telling her to "[g]et the f[***] out of here" and "[d]o you see that it's not [Evan] that I am trying to break? It's you. It's you. Do you not see that? He is easily trained. Why are you messing with this? Do I got to be on top of you?" Plaintiff also testified that defendant would "restrain [Evan's] hands [when Evan] cried" and "swing the baby violently" to prevent Evan from crying.

Plaintiff described an argument in which defendant "was throwing things off . . . the kitchen table." Plaintiff explained she "thought he was going to the

bathroom where he kept a loaded handgun and [would] possibly use the gun."

Plaintiff testified that plaintiff's mother texted a "code word" to plaintiff's friend alerting the friend to call the police who responded but did not arrest or charge defendant after speaking to the parties. According to plaintiff, after the police left, defendant told her he had "made them believe that [she was] a f[***]ing hormonal b[****] and that [she] had postpartum depression." Plaintiff said defendant then took her phone, so she called the police for help on the house landline. However, plaintiff did not seek a TRO "[b]ecause [defendant] had not been physically abusive to [her] and [she] was afraid that if [she] had to call the police one more time, that . . . they would fail to assist [her]."

Plaintiff testified that in March 2020, she visited her doctor and disclosed defendant's abuse, and as a result of that discussion, "got . . . a burner . . . cell phone because [she] was afraid [she] would need one to make . . . an emergency call" because defendant "used to take [her] phone away." She also testified that she "got a . . . laptop and [she] visited a divorce attorney." Plaintiff again entrusted a friend with a code word and a burner phone, instructing "don't hesitate, don't call, don't ask, just call the police . . . because I'm in danger."

Plaintiff testified that in May 2020, Evan's pediatrician called the police to report plaintiff's complaints of domestic violence. She further testified that when the police arrived at the house to investigate, she informed the police she

feared for her own and her child's safety as a result of "[defendant's] mental issues; . . . erratic behavior; . . . heavy drinking; . . . PTSD; the things that he had . . . said in the past," and reported defendant kept loaded firearms in the bedroom." The police seized all weapons in the house, including loaded firearms in the nightstand and dresser, arrested defendant, and plaintiff obtained the TRO against defendant.

Plaintiff testified regarding her allegations in the TRO, confirming defendant "walk[ed] around with [a] rifle inside the residence." She further testified that defendant threatened, "[b****], I will kill you if you take the baby away from me." She recalled an incident when defendant "strapped [Evan] to the baby bouncer" as he cried and physically prevented her from attending to the baby. She recorded those incidents, and played the audio at trial, confirming her testimony.

Defendant admitted at trial he said he "would break the baby's kneecaps," referring to Evan and "might throw [Evan] out of the window," but claimed that it was a "joke," and he has a "darker . . . sense of humor," and understood it was "inappropriate."

Defendant testified that he was originally charged with endangering the welfare of a child, two counts of terroristic threats, and unlawful possession of a weapon and high-capacity magazines, but the charges against him were

11

dismissed except for the ammunition charges. The Division of Child Protection and Permanency (the Division) investigated, but plaintiff testified the Division closed its case in August 2020.

Defendant testified that any arguments were largely due to the parties' "difference and approach [to] parenting." He described plaintiff as a "helicopter mom" and explained he wanted Evan to be "self-sufficient" and "confident in himself to not have to rely on others to help for . . . issues . . . or problems that are kind of inconsequential." He explained that when he referenced himself as a "killer," he was simply referring to his being a Marine. He described himself as a gun "enthusiast," with his guns "[v]ery infrequently" out of the safe.

Dr. Winston testified at trial regarding the results of her risk assessment. The doctor explained that she reviewed the audio and video recordings taken by plaintiff, documenting various encounters with defendant. Finding these recordings "significant" because they demonstrated "a pattern of verbally abusive behavior by [defendant] towards [plaintiff]," Dr. Winston described defendant's treatment of plaintiff as "very demeaning," emphasizing his use of profane and derogatory statements regarding the child. Dr. Winston found defendant's behavior and statements "very concerning" and explained that most of what defendant said to plaintiff was "very irrational and aggressive and . . . sounded baseless."

She also interviewed plaintiff, who described her marriage with defendant as "very rough" the first year, explaining that the violence intensified after their child's birth. Dr. Winston found plaintiff to be credible as her reports were "consistent with what [Dr. Winston] heard and saw on the audio and videos." Plaintiff informed Dr. Winston that defendant stored guns in the house and had "threatened to murder one of his friends."

Dr. Winston testified at trial that she reviewed defendant's health and psychiatric records and assessments including an evaluation of defendant in January 2008. Those records confirmed defendant was diagnosed with PTSD and was admitted for inpatient treatment for "[b]enzodiazepine dependence, alcohol abuse, anxiety, [PTSD], ADHD, and intermittent explosive disorder." The records further confirmed that defendant was "resistant to therapy."

Dr. Winston also spoke with defendant's therapist who had been working with him since August 2020, Patricia De Pol, M.A., Ed.S. According to Dr. Winston, De Pol questioned plaintiff's stability and whether plaintiff "was trying to alienate [Evan] from his father." However, Dr. Winston found De Pol, who had never spoken with plaintiff, biased and was basing her conclusions solely "on her conversations with [defendant]."

Dr. Winston interviewed defendant in person. According to Dr. Winston, defendant denied any acts of domestic violence, describing the parties' marriage

13

difficulties as "differences of opinion." He expressed that the child was "trying to manipulate" his parents by crying, which Dr. Winston described as "odd" and not credible. Although defendant told Dr. Winston that "he felt remorseful" for his behavior, the doctor found "that he . . . was really minimizing and explaining away all of his behaviors, rationalizing his behaviors" and she did not "get any sense that he was really contrite about what he had done." Dr. Winston opined:

> [Defendant's] behaviors were . . . very excessive, concerning, extremely inappropriate, and the fact that he is not able to demonstrate any insight into the fact that his behaviors are inappropriate, to acknowledge that maybe he needs to change, means that he's not motivated to engage in any services to change.
>
> Because . . . he thinks that . . . the way he is, is fine. He's doing everything according to the book. He's not doing anything wrong, so why . . . is he being punished and . . . why should he have to do anything differently[?]

Dr. Winston opined that defendant lacked insight into his condition. Although defendant acknowledged he had been diagnosed with PTSD, he "denied any depressive episodes" and said that "he may have been suicidal back in 2008, but denied any more recent suicidal ideation or thoughts" and he "denied that he tends to be easily angered."

14

As part of her assessment, Dr. Winston administered various tests and concluded that all results were "within normal limits." Nevertheless, Dr. Winston explained those seemingly contradictory results, opining that defendant

> has really convinced himself that . . . the person he was presenting himself as to me is who he really is. And he has these ideas about himself that are so deeply ingrained that he was able to respond to psychological testing in a non-defensive manner. And . . . that's who he genuinely thinks he is. But he is suppressing so much that he's not aware of and that when he's triggered, he just lashes out uncontrollably.

Dr. Winston found defendant to be "[o]verall not credible." She concluded defendant has "serious anger management issues which he refuses to acknowledge" noting that based upon her review of the recordings and her interviews with plaintiff and defendant, defendant "has engaged in highly verbally abusive behavior towards his wife in his son's presence" and "demonstrates no awareness of how that . . . could affect his son."

Dr. Winston did not believe defendant could safely parent the child without supervision, finding he posed a risk of harm to his son, and diagnosing defendant, within "a reasonable degree of psychological certainty," with "unspecified depressive disorder, unspecified personality disorder, [and] moderate alcohol use disorder in early remission." She found him a "perpetrator of spousal or partner psychological abuse, and disruption of family by separation

15

or divorce." Dr. Winston recommended defendant exercise therapeutic supervised parenting time with the child, that "he engage in anger management/batterers intervention counseling," "individual psychotherapy," and "[p]arenting skills classes."

Dr. Winston acknowledged her report was from late 2020, but found it "unlikely" that defendant had changed since her evaluation. She confirmed someone with PTSD can still be a "great parent," and that she did not think defendant ever intended to harm Evan.

Dr. Singer issued a report in April 2022 and testified at the trial as a "forensic psychologist [expert] . . . specializing in the area of custody and parenting time." Dr. Singer administered testing, finding defendant's results "suggested impulsivity, good ego strength, and a history of antisocial behavior." He explained that defendant's parenting skills instructor reported defendant "engaged appropriately," and his therapists reported "no safety concerns regarding" defendant, and he spoke with Steven Rego, another therapist, who indicated there was "no evidence of active PTSD symptoms."

Dr. Singer consulted with Dr. Winston, who "stood by her report," with which Dr. Singer "didn't have concerns, per se." Dr. Singer agreed that defendant "did not understand that [his] verbal behavior . . . could constitute domestic violence." Dr. Singer indicated "from his perspective [defendant] had

A-3444-22

no malice, no evil intent" in his communications to plaintiff on the recordings and defendant "characterize[d] some of it as joking" or "like locker room talk." Dr. Singer acknowledged that the recordings were "demeaning," "verbally aggressive," and "inappropriate in terms of exposure to a wife and . . . to a child." Dr. Singer observed defendant interact with Evan and reported that "the observations were very consistent with a child who has formed a foundation for a healthy relationship with [defendant]."

Dr. Singer opined that plaintiff should be named the parent of primary residence and defendant the parent of alternative residence and that the parties retain a parenting coordinator. He recommended that defendant "re-engage as soon as possible in [a] therapeutic supervised visitation program," with a goal "[a]t a point in time where things progress, certainly moving to regular supervised visitation, to be able to integrate overnights" and to eventually get to the point where "father and son can enjoy unsupervised parenting time." He further recommended defendant "get a sponsor" for his alcohol issues and participate in therapy to continue to address his PTSD. Dr. Singer explained that joint custody would give Evan the "benefit of two healthy parents making decisions that affect the child," but acknowledged that "frankly, a lot of it rests on [defendant's] ability to commit" so "it's very difficult to set a bright-line timeframe" for parenting time.

17

Plaintiff sought to have the civil restraints agreement incorporated into the FJOD, and she requested that Safe Harbor serve as the supervising provider for defendant's visitation as it is a licensed provider with procedures in place to prevent plaintiff from having "any physical contact" with defendant. She further testified defendant was searched before every visit and the therapist at Safe Harbor "debriefed" plaintiff after every visitation.

Plaintiff expressed concerns regarding Resolve, where she claimed she encountered defendant at appointments and therapists were not licensed. She did not feel Resolve sufficiently safeguarded Evan's or her safety and well-being, explaining they lacked the domestic violence safety protocols employed at Safe Harbor. However, because Safe Harbor had terminated its supervision services, plaintiff requested therapeutic visitation to occur at Grace Abounds Counseling & Psychological Consulting, LLC (Grace Abounds), since "they are the closest in excellence in comparison to Safe Harbor." Defendant countered that he felt "belittled" at Safe Harbor and preferred Resolve where he "had a great" experience and "very positive" time with Evan.

Jawann Westerman, defendant's therapeutic supervisor at Resolve, testified that he was unlicensed, and needed an additional 1,200 hours of supervised clinical experience to obtain his license. Westerman testified at trial that he "watched th[e] bond grow" between defendant and Evan over time.

18

Westerman described plaintiff as "very concerned" and "very fearful that [defendant] was going to hurt [Evan]," which Westerman described as "a little over-protective."

With respect to custody, plaintiff sought sole legal and physical custody of Evan because she feared defendant would "harm the child psychologically, emotionally, and physically" and was not "equipped to care for the child or [make] any sound decisions on his behalf." Further, according to plaintiff, defendant's behavior had not changed and would not change now that Evan was a challenging toddler. Plaintiff maintained that she wished defendant to have contact with his son in a safe and unbiased environment.

Plaintiff also petitioned to change Evan's name to reflect both parties' last names. She testified that it was important to her for Evan to have both names as is the custom "in [her] culture," and that Evan was three at the time of trial and did not know his last name yet. She indicated she would be returning "[s]olely to [her] maiden name" following the divorce and this would lessen confusion for the child. Defendant disputed that the name change would be in Evan's best interest, citing only that the parties had "agreed" and "discussed his name before he was born."

Concerning child support, plaintiff sought $900 per week including defendant's share of health insurance and childcare costs. Plaintiff certified her

19

salary was $105,000 and defendant's salary was $165,000 and his "non-taxable net benefits" from his military disability payments were "approximately $49,000 per year." She also certified the parties had agreed that child support would include the cost of Evan's school and health insurance and detailed her monthly expenses for Evan, noting she was "responsible for every meal, every incidental, every piece of clothing, everything that Evan needs" and that "[d]efendant does not have to incur the same costs." Plaintiff's Child Support Guidelines Worksheet, dated May 18, 2023, indicated the parties had "high combined income" and defendant's child support obligation would be $863 per week based upon the guidelines.

Defendant proposed that he pay $589 per week. Defendant also reported his annual salary as $165,000 and his non-taxable benefits of approximately $45,000 in disability compensation and $3,960 per year in "Combat-Related Special Compensation." Defendant's proposed Child Support Guidelines Worksheet indicated that the child support award should be set at $589 per week.

Defendant acknowledged in his letter that the parties' combined income exceeded the guidelines but argued that $589 per week was reasonable to provide for Evan's needs. Defendant argued that plaintiff's Case Information Statement (CIS) indicated expenses that were not related to Evan, and he argued that there were "no grounds" to support any supplemental child support beyond

20

that of the guidelines based on plaintiff's monthly expenses in her CIS. Defendant also argued Evan's school tuition was "not necessary at this time" because "he could be enrolled in free, municipal Pre-K for the upcoming year." Defendant argued plaintiff failed to provide documentation as to Evan's "actual" needs.

## II.

After trial, the court entered the FJOD and issued a detailed written opinion dissolving the marriage, incorporating the consent order for civil restraints into the FJOD, changing Evan's name to E.A-C., granting plaintiff sole legal and physical custody of Evan, and awarding plaintiff $750 per week in child support. The court expressed its understanding that Evan "is in the best position to grow and thrive, physically and emotionally, if he has two parents in his life." It acknowledged the goal of "safely expand[ing] defendant's parenting time . . . revolves around [d]efendant's fitness, such that [Evan] will be safe in his father's care . . . [which was] greatly in question based on the evidence presented." The court then thoroughly evaluated the record and methodically provided the reasons for its decision.

The trial court assessed defendant's demeanor and credibility, finding he "remained stoic and calmly answered all questions asked." The court nevertheless found defendant's "actual answers to those questions continued to

21

be alarming." The court found plaintiff clearly presented as a person in genuine fear for her safety and that of her child. Specifically, the court found plaintiff "is clearly a person who was absolutely petrified, with good reason, and who continues to be justifiably afraid of [defendant]."

Accordingly, regarding parenting time, the court ordered defendant to begin therapeutic supervised visitation at Grace Abounds and to have two twenty-minute Facetime calls with Evan each week. The trial court found Resolve is insufficient to accomplish" "build[ing] towards more parenting time for [defendant]." The court further ordered defendant's parenting time to increase to once weekly for six hours after ninety days if "the visitation has not raised any issues" and that after three months, "the parties shall attempt to mediate to see if agreement can be reached as to further parenting time."

The court noted "[t]here is . . . no question that [defendant] loves [Evan] and wants to have a relationship with him"; however, the court found defendant's "fitness" to exercise parenting time with Evan "remains greatly in question, based on the evidence presented." The trial court summarized the record and characterized the recordings as defendant "screaming at [plaintiff] in profanity laced language" and "mimicking the baby crying." The court found "while [defendant] admitted that his behavior on the recordings was 'inexcusable and

inappropriate,' that is as far as he would go" and defendant "continues to deny he committed acts of domestic violence or harassment."

The court noted defendant's "attitude . . . dovetail[ed] with Dr. Winston's observations, including that she believe[s] he has convinced himself that he's normal, and lacks motivation to change." The court also found it "concerning . . . that [defendant] believes he does not have anger issues" which "suggests a profound lack of insight." The judge placed minimal weight on defendant's agreeing to civil restraints, as, "on cross-examination[,] it became perfectly clear that [the terms] were 'box checking' experiences for him." The court found "this made Dr. Winston's testimony that [defendant] is 'going through the motions' resonate loudly." The judge noted Dr. Winston's well-reasoned evaluation and opinions and considered them based on an "abundance" of information.

The court noted that defendant "said [p]laintiff had no reason to feel intimidated," but "[i]n listening to this, [the court] kept wondering, what is it about a burner phone and secret code word that [defendant] didn't understand or appreciate." Indeed, the court found it "truly remarkable . . . that the domestic violence matter was settled with a [c]onsent [o]rder for [c]ivil [r]estraints" because "[t]he proofs of the need for a [f]inal [r]estraining [o]rder are simply overwhelming."

23

The trial court did not accord weight to the testimony of Dr. Singer. Although acknowledging Dr. Singer "is a talented psychological professional, and clearly possesses substantial knowledge beyond that of an average fact finder," the court deemed "his opinions [we]re clearly a net opinion," as Dr. Singer "simply gathers facts and then analyzes them against the factors in N.J.S.A. 9:2-4. That is the job of the court, and at the end of the day it is simply his opinion."

The court then considered the custody factors set forth in N.J.S.A. 9:2-4 finding: (1) "[t]here is a complete and total absence of any ability to communicate between these parties"; (2) "[b]oth parties are willing to accept custody and parenting time"; (3) defendant's interaction with Evan "needs to expand when it is safe to do so"; (4) "there is a substantial history of domestic violence by [d]efendant against [p]laintiff and the child"; (5) "[t]he safety of [Evan] is still not completely assured if the past is prologue, and Dr. Winston's testimony . . . heightens those concerns"; (6) the preferences of the child are not applicable here; (7) "[t]his child is still extremely young and needs complete care . . . [and] is not in a position to protect himself"; (8) "[p]laintiff offers a stable, safe and nourishing home for the child"; (9) the quality of Evan's education is "[n]ot an issue at present"; (10) the parties' geographical proximity does not present an issue; (11) the extent of parenting time before and after

separation is relevant; (12) neither party's employment impacts parenting ability; and (13) there are no siblings to consider.

Assessing the record under the custody factors, the court awarded sole legal and physical custody to plaintiff finding it presently "clear" "she is the only parent capable of making decisions as to what is in his best interest." The judge expressed "hope" this would change in the future, but found it was "not feasible at present." The court prospectively ordered defendant's parenting time to increase to one six-hour day weekly after ninety days with the goal to increase from there as defendant progresses. To that end, the court noted:

> [T]he parties should be clear that the plan here is for [defendant's] time with [Evan] to continue to build, to the point at some time in the future where he can enjoy unsupervised parenting time and overnights. If the parties cannot agree when and under what circumstances that can take place, they must regrettably return to court.

In considering the application for Evan's last name change, the trial court applied the requisite factors, see Emma v. Evans, 215 N.J. 197, 223 (2013), and determined adding plaintiff's maiden name by hyphenation with defendant's to be in Evan's best interests and "will reduce any possible confusion." It found in relevant part that Evan was too young to "appreciate his current last name," the "family unit is changing" by divorce, that plaintiff is returning to her maiden

name resulting in Evan's parents having different last names, that there is no bad faith by either parent and no sibling bonding issues to consider.

Regarding child support, the trial court found the combined income exceeded $187,200, and "use[d] its discretion to set an appropriate obligation." The court discussed the factors under N.J.S.A. 2A:34-23(a) and set defendant's weekly child support at $750. The court also ordered defendant to "pay an additional $2,000 per month until his existing arrearages are satisfied." The court determined that "the parties shall share in reasonable extracurricular expenses, camp expenses, and work[-]related childcare costs for [Evan] . . . with [p]laintiff responsible for 35% and [d]efendant responsible for 65% of same."

III.

Defendant appeals, claiming the court erred in awarding sole custody to plaintiff and in granting only supervised parenting time for defendant, asserting the court improperly disregarded Dr. Singer's testimony as net opinion; unduly restricted defendant's questioning of Dr. Singer; relied on Dr. Winston's report that was not in evidence; mistakenly found Resolve unsuitable for therapeutic supervision of defendant's parenting time; and failed to consider pertinent facts in its determination. Defendant also challenges the court's November 2022 denial of unsupervised parenting time and the order denying reconsideration, the

order granting Evan's name change, and the award of $750 weekly in child support.

## IV.

The scope of our review of Family Part orders is limited. See Cesare v. Cesare, 154 N.J. 394, 411 (1998). We afford substantial deference to the Family Part's findings of fact based on adequate, substantial and credible evidence in the record, understanding the court's special expertise in family matters. Id. at 412-13; MacKinnon v. MacKinnon, 191 N.J. 240, 253-54 (2007). No special deference is accorded to the judge's legal conclusions, Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995); however,

> we "should not disturb the factual findings and legal conclusions of the trial judge unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice" or when we determine the court has palpably abused its discretion.
>
> [Parish v. Parish, 412 N.J. Super. 39, 47 (App. Div. 2010) (quoting Cesare, 154 N.J. at 412).]

## V.

### A.

We turn first to defendant's argument that the court abused its discretion when it awarded plaintiff sole legal and physical custody and did not

27

immediately expand defendant's parenting time. Having reviewed the record and the court's detailed decision in conjunction with established legal principles, we discern no abuse of discretion.

"In custody cases, it is well settled that the court's primary consideration is the best interests of the children." Hand v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007). N.J.S.A. 9:2-4 governs custody determinations and provides:

> In making an award of custody, the court shall consider but not be limited to the following factors: [(1)] the parents' ability to agree, communicate and cooperate in matters relating to the child; [(2)] the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; [(3)] the interaction and relationship of the child with its parents and siblings; [(4)] the history of domestic violence, if any; [(5)] the safety of the child and the safety of either parent from physical abuse by the other parent; [(6)] the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; [(7)] the needs of the child; [(8)] the stability of the home environment offered; [(9)] the quality and continuity of the child's education; [(10)] the fitness of the parents; [(11)] the geographical proximity of the parents' homes; [(12)] the extent and quality of the time spent with the child prior to or subsequent to the separation; [(13)] the parents' employment responsibilities; and [(14)] the age and number of the children.
>
> [N.J.S.A. 9:2-4.]

We recognize, "[b]oth parents have an equal right to custody of their child." W.M. v. D.G., 467 N.J. Super. 216, 229 (App. Div. 2021) (citing

28

N.J.S.A. 9:2-4). "While there is a presumption supporting a natural parent's right to the care, custody, and control of his or her child, this presumption in favor of the parent will be overcome by a showing of gross misconduct, unfitness, neglect or exceptional circumstances affecting the welfare of the child." Id. at 230 (quoting K.A.F. v. D.L.M., 437 N.J. Super. 123, 131-32 (App. Div. 2014)) (internal quotation marks omitted).

Here, the court's findings were supported by substantial, credible evidence in the record. The court carefully evaluated the testimony and evidence and discussed each factor set forth under N.J.S.A. 9:2-4. The history of domestic violence was documented.

Dr. Winston testified she did not believe defendant could safely parent Evan without supervision, and both Dr. Winston and Dr. Singer acknowledged defendant's lack of insight into his conduct, particularly his inability to recognize his actions as domestic violence. The evidence supported the court's concern for the child's safety. Thus, the trial court in its discretion determined that at this time plaintiff "is the only parent capable of making decisions as to what is in [Evan's] best interest." We perceive no basis to disturb the trial court's custody that was amply supported by the record.

Defendant argues that the court erroneously disregarded Dr. Singer's testimony as net opinion, limiting defendant's use of leading questions in

questioning the doctor. Although we agree that Dr. Singer's testimony amounted to more than simply net opinion, we find any error harmless.

"The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by the factual evidence or other data.'" Townsend v. Pierre, 221 N.J. 36, 53 (2015) (alteration in original) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). The rule requires that an expert "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011)). The rule mandates that experts "be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and methodology are scientifically reliable." Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992).

In his court-appointed function, Dr. Singer interviewed and tested both parties and observed Evan with defendant. He testified regarding the interviews and the records he relied on in reaching his conclusions and in making his recommendations in accordance with Rule 5:3-3(b).[3]

---

[3] Rule 5:3-3(b) states:

Dr. Singer was appointed to conduct a "custody/best-interest evaluation," and was well within his purview as an expert in a custody and parenting time dispute case to "gather[] facts and . . . analyze[] them against the factors in N.J.S.A. 9:2-4." He accomplished that evaluation and rendered his opinion based upon that data. Although we conclude that the court erred in deeming Dr. Singer's finding to be net opinion, such error was harmless.

As our courts have stated, "[a] trial court is free to accept or reject the testimony of either side's expert, and need not adopt the opinion of either expert in its entirety." Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002). Thus, the trial judge was within his discretion to afford weight to the record and testimony it found credible, including Dr. Winston's testimony, and give no weight to Dr. Singer's testimony, particularly given the trial court's role as the factfinder. In addition, we see no basis to conclude that the trial court's custody or parenting time decisions would have been different had the court not deemed Dr. Singer's opinion net.

Mental health experts who perform parenting/custody evaluations shall conduct strictly non-partisan evaluations to arrive at their view of the child's best interests, regardless of who engages them. They should consider and include reference to criteria set forth in N.J.S.A. 9:2-4, as well as any other information or factors they believe pertinent to each case.

A-3444-22

Indeed, the order of therapeutic supervised parenting time for defendant with potential to increase and change in the future was anchored in the record and not inconsistent with Dr. Singer's parenting time recommendations. Plaintiff's testimony and evidence demonstrated defendant's verbal abuse towards both Evan and plaintiff in Evan's presence, and the court found of particular concern defendant's lack of insight into how his conduct might affect Evan. Both Dr. Winston and Dr. Singer recommended defendant exercise therapeutic supervised parenting time that could hopefully expand, which is precisely what the judge ordered. There is notable consistency between the court's prospective framework for increasing defendant's role in the child's life and Dr. Singer's proposal, and the doctor acknowledged an inability to predict that time frame as "frankly, a lot of it rests on [defendant's] ability to commit."

Defendant's contention that the court erred when it instructed defense counsel not to ask leading questions of Dr. Singer on direct examination lacks merit. At the beginning of defendant's direct examination of Dr. Singer, plaintiff objected, and the court agreed that defendant was improperly asking leading questions. Because the court complied with evidentiary rules, we see no abuse of discretion in its ruling. See N.J.R.E. 611(c).

Defendant also argues that the trial court "inappropriately relied on" Dr. Winston's report, which was not entered into evidence. This is likewise

unavailing. Although the court referenced Dr. Winston's report in its findings, nothing in the court's opinion suggests it relied unduly on Dr. Winston's report when it rendered its decision on custody and parenting time. Dr. Winston testified to the contents of her report at trial and detailed the significant background information she reviewed in preparing and conducting her risk assessment. Defendant concedes he "cannot . . . ascertain" whether any reliance on Dr. Winston's report affected the trial court's ultimate decision regarding custody and parenting time. We are satisfied the judge's findings were rooted in the testimony and evidence presented at trial and that any passing reference to the Winston report was harmless at most.

Defendant's argument that the court erred when it ordered therapeutic supervised visitation at Grace Abounds rather than continuing at Resolve similarly lacks merit. Given this court's "deferential standard of review, recognizing the court's 'special jurisdiction and expertise in family matters,'" Thieme v. Aucoin-Thieme, 227 N.J. 269, 282-83 (2016) (quoting Cesare, 154 N.J. at 413), and recognizing the trial court's findings "supported by adequate, substantial, credible evidence," Cesare, 154 N.J. at 411-12, we conclude the trial court's decision to change therapeutic supervised visitation from Resolve to Grace Abounds was supported by credible evidence in the record. Many of plaintiff's concerns regarding Resolve were confirmed by Resolve's therapist,

33

Westerman, who testified he is not yet a licensed therapist experienced in conducting therapeutic supervised visitation. Further, plaintiff testified that Resolve's lack of safety protocols failed to protect her from contact with defendant as required by the civil restraints agreement. Thus, the judge's finding that Resolve's services were "insufficient" in this case was supported by substantial credible evidence in the record.

Defendant's challenges to the court's pre-trial orders pertaining to supervised parenting time also fail. Courts retain power to alter or revise interlocutory orders, including a pendente lite parenting time order, at any time prior to the entry of final judgment upon good cause shown. Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 261-64 (App. Div. 1987); see also R. 4:42-2. Due to their "temporary nature," provisions of pendente lite orders "do not survive the entry of a judgment of divorce unless expressly preserved in it or reduced to judgment prior to entry of final judgment." Mallamo v. Mallamo, 280 N.J. Super. 8, 12 (App. Div. 1995); see also Bauza v. Bauza, 201 N.J. Super. 540, 542-43 (App. Div. 1985) (holding that a pendente lite counsel fee award not expressly preserved merges into final judgment).

Here, the trial court's final judgment of divorce did not "expressly preserve[]" any pendente lite orders, including the November 4, 2022 and January 6, 2023 orders that declined to change defendant's parenting time

34

pendente lite. <u>Mallamo</u>, 280 N.J. Super. at 12. Thus, any pendente lite order regarding parenting time did not "survive entry" of the final judgment of divorce. <u>Ibid.</u>

## B.

We next consider and reject defendant's argument that the court erred in adopting the parties' prior civil restraints into the FJOD, particularly the provision keeping plaintiff's address confidential.

We are satisfied the record supports the need for continued restraints as previously negotiated by the parties. We need not recount the history of domestic violence we have already exhaustively identified that was woven throughout the trial record except to conclude that it amply supports the trial court's imposition of restraints to prevent future risk of harm.

Defendant specifically argues on appeal that the trial court "made no findings" as to how maintaining the confidentiality of plaintiff's address was in Evan's best interest, asserting "[t]here was no basis in law or fact that would allow the trial court to arrive at such a decision." The civil restraints agreement indeed provided that defendant should not seek access to plaintiff's new address while the divorce was pending, but added that defendant was not waiving his ability to challenge plaintiff's address confidentiality after the divorce was adjudicated.

We recognize that the trial court ordered "that the [c]onsent [o]rder for [c]ivil [r]estraints" be "incorporated into this [FJOD] and remains in full force and effect" without expressly isolating the address confidentiality provision. However, the court clearly impliedly retained that protection. Finding "a substantial history of domestic violence by [d]efendant against [p]laintiff and the child," the trial court, aware of the nature and scope of the prior restraints agreement, incorporated those protections into the FJOD in their entirety. The court was satisfied that plaintiff was "absolutely petrified, with good reason, and . . . continues to be justifiably afraid of [defendant]" particularly when she got "a burner phone" and had "a secret code word." The court found "[t]he proofs of the need for a [f]inal [r]estraining [o]rder . . . overwhelming."

The record details defendant's verbal abuse and threats towards plaintiff, often in Evan's presence, and his lack of present insight into the dangerousness of his conduct. Thus, the record undermines defendant's assertion that plaintiff's testimony portrayed only "subjective fear." We will not disturb the court's order to continue the restraints, including the confidentiality of plaintiff's address.

C.

Defendant also argues the court erred in changing Evan's last name to reflect both parties' last names. We disagree.

36

Our courts "are required to engage in meticulous fact-finding to determine the 'best interests' of the child . . . in determining the appropriate surname to be given to a child, regardless of the child's birth status." Gubernat v. Deremer, 140 N.J. 120, 139 (1995). A past "strong presumption in favor of the surname chosen by the custodial parent," id. at 144, has given way to the acknowledgment that "while [the presumption] made compelling sense in the setting in which it arose, its continued use arguably can shrink the best-interests analysis to an automatic endorsement of the primary custodial parent's choice in a renaming dispute." Emma, 215 N.J. at 218.

Further, "in renaming disputes between parents who agreed on a surname at birth but find themselves later in a dispute over whether to alter the surname, the proper standard to apply is the best interests of the child." Id. at 218-21 (the Court "fail[ed] to see the appropriateness of any form of presumption in . . . settings" such as "where the name change dispute arises after the surname originally was selected jointly by the parents of the child"). "[A]s part of the gender-neutral and child-centered totality-of-the-circumstances" best-interests analysis, courts consider:

> 1. The length of time the child has used his or her given surname.
>
> 2. Identification of the child with a particular family unit.

3. Potential anxiety, embarrassment, or discomfort that may result from having a different surname from that of the custodial parent.

4. The child's preference if the child is mature enough to express a preference.

. . . .

5. Parental misconduct or neglect, such as failure to provide support or maintain contact with the child.

6. Degree of community respect, or lack thereof, associated with either paternal or maternal name.

7. Improper motivation on the part of the parent seeking the name change.

8. Whether the mother has changed or intends to change her name upon remarriage.

9. Whether the child has a strong relationship with any siblings with different names.

10. Whether the surname has important ties to family heritage or ethnic identity.

11. The effect of a name change on the relationship between the child and each parent.

[Id. at 223.]

The best-interests analysis is ultimately "fact-sensitive" and "[e]ach case should be weighed on its own merits." Id. at 222.

The trial court's decision to change Evan's name is firmly supported by the record. See Cesare, 154 N.J. at 411-12. The judge analyzed all appropriate

38

factors and found that the name change was in Evan's best interest, particularly given his young age, and to prevent confusion in the future for Evan, as plaintiff made clear she intended to use her maiden name going forward.

D.

Finally, we consider defendant's challenge to the court's order that he pay child support in the amount of $750 per week. However, because the court did not provide its reasoning for setting that amount, we are unable to properly review the order.

The parties did not seem to dispute each other's income, yet their proposed Child Support Guidelines calculated differing weekly amounts for defendant's obligation. Plaintiff proposed $900 per week; defendant proposed $589.

The court found that plaintiff earned $105,000 per year and that defendant earned $165,000 per year plus $45,000 per year in disability benefits. The trial court found that "the combined income of the parties is well in excess of $187,200, so the [c]ourt must use its discretion to set an appropriate obligation." Although the court discussed the child support factors under N.J.S.A. 2A:34-23(a), it stated only that "[b]ased on the [c]ourt's consideration of the factors . . . and the submissions of both parties . . . $750 per week [was] a reasonable child support obligation to be assessed against [d]efendant." The court failed to explain how it reached that amount.

Whatever the court's methodology, it must state its reasons. <u>Rule</u> 1:7-4 requires trial courts to make findings of fact and conclusions of law, and we cannot uphold Family Part orders absent sufficient findings or stated reasons. <u>See</u> <u>Fodero v. Fodero</u>, 355 N.J. Super. 168, 170 (App. Div. 2002). Because we cannot identify the facts, law, or rationale the court employed in arriving at the child support award, we are constrained to vacate the portion of the court's order, and remand the matter to the Family Part to make the appropriate findings, anchored by a sufficient statement of its reasons.

Affirmed in part, vacated in part, and remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3444-22